IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ENOH I. ENOH, CHRISTOPHER JACKSON, DEREK L. MOBLEY and WILLIAM MURRELL, for and on behalf of themselves and other persons similarly situated, | ) ) ) ) ) | Case No.: |
| | ) | CLASS ACTION COMPLAINT |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL DEMANDED |
| vs. | ) | |
| | ) | |
| HP INC. and HEWLETT PACKARD ENTERPRISE COMPANY, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

## I.    INTRODUCTION[1]

This case challenges discriminatory employment practices of HP, Inc. ["HPI"]

and Hewlett Packard Enterprise Company ["HPE"] [collectively "Defendants"] as

they relate to former and current African-American employees and applicants over

---

[1]On July 24, 2017, the Plaintiffs filed an action in the United States District Court for the Northern District of California [San Jose Division] styled *Enoh I. Enoh, et al., v. Hewlett Packard Enterprise, et al.,* Case No. 17-cv-04212-BLF alleging age and race discrimination in employment.  Subsequent to the Plaintiffs filing of their lawsuit, the Defendants, Hewlett Packard, Inc. and Hewlett Packard Enterprise, filed a motion to dismiss for, inter alia, improper venue. [See, Doc.#61-*Enoh I. Enoh, et al., v. Hewlett Packard Enterprise, et al., Case No. 17-cv-04212-BLF*].  On July 11, 2018, the Judge Beth Labson Freeman granted the Defendants' motion to dismiss for improper venue without prejudice to re-filing in a district that satisfies the requirement of 42 U.S.C. § 2000e-5(f)(3) [Title VII's venue provision].

the age of forty (40).  Plaintiffs, Enoh I. Enoh, Christopher Jackson, Derek Mobley, William Murrell, [collectively "Plaintiffs"], allege that the Defendants engaged in a demonstrable policy of race and age discrimination in hiring, promotions, and lay-offs in violation of Title VII of the Civil Rights Act of 1964 ["Title VII"], 42 U.S.C. § 1981, and the Age Discrimination in Employment Act of 1967 ["ADEA"]. The Representative Plaintiffs would aver as follows:

HPI and HPE have followed a general practice of discriminating against African-Americans/blacks, and individuals over the age of forty (40), on the basis of race/color and/ or age with respect to hiring, promotions and lay-offs by enforcing a corporate policy and practice that expressly and impliedly discourages them from seeking higher paying and higher responsibility positions which has systematically denied African-American/blacks, and individuals over the age of forty (40), the same opportunities as Caucasian and/or younger employees;

This continuing systemic pattern and practice of race and/or age discrimination in employment has affected the Class Representatives and the class members they seek to represent in the following ways:

> a.     HPI and HPE intentionally restricted and excluded African-Americans  and individuals over the age of forty (40) from higher paying and higher responsibility positions by preventing and/or discouraging them from seeking any such positions;

b.     The criteria utilized by HPI and HPE in making selection decisions-to include hiring, promotions and lay-offs-discriminate on the basis of race in violation of §703(k) of Title VII, 42 U.S.C. §2000e-2(k). HP allowed an overwhelmingly Caucasian group of selectors to use a company wide "Performance Evaluation" process for its employment decisions to the detriment of their African-American employees. These processes disparately impacted African-American employees because they allow subjectivity and favoritism to influence employment decisions. Because of this, the decision-makers are free to exercise their discretion in an unguided, subjective manner that provides a ready mechanism for Caucasians to vent discriminatory feelings upon African-American employees;

c.     HPI and HPE, in contravention of its own allegedly non-discriminatory hiring practices, does not post all jobs and instead relies on a "tap on the shoulder" procedure whereby it awards positions of higher pay and prestige to Caucasian employees;

d.     HPI and HPE initiated a Workforce Reduction Plan [hereinafter "WRP"] that was, by their own admission, aimed at making the company younger by using a "facially neutral" job shedding process that disparately impacted any member of the workforce over the age of 40 in violation of the Age Discrimination in Employment Act; 29 U.S.C. § 621;

e.     HPI and HPE intentionally and willfully discriminated against its older employees by targeting them for dismissal for "phantom" performance issues and/or as part of its greater WRP. HP then moved much younger employees into slots now vacant as a result of its discriminatory employment practices that violated of the Age Discrimination in Employment Act; 29 U.S.C. § 621; and,

3

   f. HP intentionally and willfully discriminated against its older employees with regard to promotional opportunities.

## II. JURISDICTION AND VENUE

 1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), and (4), 2201 and 2202, 42 U.S.C. 2000d-2 and 2000e5(f) , and 29 U.S.C. § 621,et seq.

 2. This is a suit authorized and instituted pursuant to the Act of Congress known as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., as amended, "The Civil Rights Act of 1866", 42 U.S.C. § 1981 and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq.

 3. Venue is proper in the Northern District of Georgia because the unlawful employment practices alleged herein were committed by the Defendant here. Venue is proper pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §1391(b).

## III. PARTIES

 4. Plaintiff Enoh I. Enoh is an African-American male, over the age of forty, and a resident of Laurel, Maryland.  Mr. Enoh worked for the Defendants from 1996 to May 26, 2017.  His last position was Field Services Engineer.

 5. Plaintiff Christopher Jackson is an African-American male, over the age

4

of forty (40), and a resident of Atlanta, Georgia.  Mr. Jackson worked for Defendants from July 15, 1996 to July 18, 2016.  His last position was District Manager.

6.     Plaintiff, Derek Mobley is an African -American male, over the age of forty (40) and a resident of Atlanta, Georgia.  Mr. Mobley is an applicant.

7.     Plaintiff William Murrell is an African-American male, over the age of forty, and a resident of Atlanta, Georgia.  Mr. Murrell is a current employee of the Defendants.  Mr. Murrell began working for the Defendants as a contract in employee in or around 2000, and did not become a regular full-time employee until 2007.  His current position is Field Service Support Representative.

8.     Defendant HP, Inc., is a corporation organized under the laws of the State of California with its headquarters and principal place of business locate at 1501 Page Mill Road, Palo Alto, California.

9.     Defendant Hewlett-Packard Enterprise Company is a corporation organized under the State of Delaware with its headquarters and principal place of business located at 3000 Hanover Street, Palo Alto, California.

## IV.   **ADMINISTRATIVE EXHAUSTION**[2]

10.     On June 26, 2017, Plaintiff Enoh I. Enoh, filed a charge of discrimination with the Baltimore Field Office of the United States Equal Employment Opportunity Commission.  The charge of discrimination is currently pending.  Plaintiff Enoh's claims arising under 42 U.S.C. § 1981 do not require administrative exhaustion.

11.     Plaintiff Christopher Jackson has fulfilled all conditions necessary to the institution of this action under Title VII.  Plaintiff Jackson received Notices of Right to Sue on or about April 25, 2017 and April 28, 2017, respectively, and is filing this Compliant within 90-days of receiving the same.  Plaintiff Jackson's claims arising under 42 U.S.C. §1981 do not require administrative exhaustion.

12.     On July 27, 2017, Plaintiff Derek Mobley filed a charge of discrimination with the Atlanta Field Office of the United States Equal Employment Opportunity Commission.   The charge of discrimination is currently pending. Plaintiff Mobley's claims arising under 42 U.S.C. § 1981 do not require administrative exhaustion.

---

[2]Plaintiff Christopher Jackson, who filed the earliest EEOC charge in this matter, received Dismissals and Notices of Right to Sue on or about April 25, 2017 and April 28, 2017, respectively.  The Complaint based on these charges was filed on July 24, 2017 in the Northern District of California. [See, Doc.# *1-Enoh I. Enoh, et al., v. Hewlett Packard Enterprise Company, et al.,* Case 5:17-cv-04212-BLF].

13.     On June 23, 2017, Plaintiff William Murrell, filed a charge of discrimination with the Atlanta Field Office of the United States Equal Employment Opportunity Commission.    The charge of discrimination is currently pending. Plaintiff Murrell's claims arising under 42 U.S.C. § 1981 do not require administrative exhaustion.

V.     **STATEMENT OF FACTS**

14.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs with the same force and effect as if fully set out in specific detail herein.

15.     In May 2012, Hewlett-Packard ["HP"] launched what it termed a multi-year restructuring plan to "fuel innovation and enable investment".  As part of this strategy, HP announced that it expected "approximately 27,000 employees" to exit the company by fiscal year 2014.

16.     The company proposed accomplishing this goal through the offering of "early retirement" packages.  The "early retirement" program for U.S. employees would be based on whether the impacted individual's combined "age and years of service" exceeded certain levels. Attached to this pleading is a copy of the HP Workforce Reduction plan provided to Plaintiff Jackson.

17.     The decision was announced and disseminated by HP from its 3000 Hanover Street, Palo Alto California address, which was the location of its principal

executive offices.

18.    On October 9, 2013, during a Hewlett-Packard Securities Analyst

Meeting, company President and CEO, Meg Whitman, expressed the following when

discussing the next generation of IT professionals:

> But I think what was embedded in that question is a question that is actually completely relevant for all large-cap IT companies, which is how do you keep up with this next generation of IT and how do you bring people into this company for whom it isn't something they have to learn, it is what they know?
>
> ***
>
> So, as we think about our overall labor pyramid at Hewlett-Packard, we need to return to a labor pyramid that really looks like a triangle where you have a lot of early career people who bring a lot of knowledge who you're training to move up through your organization, and then people fall out either from a performance perspective or whatever.
>
> ***
>
> And over the years, our labor pyramid doesn't look -- has become not a triangle. It's become a bit more of a diamond. And we are working very hard to recalibrate and reshape our labor pyramid so that it looks like the more classical pyramid that you should have in any company and particularly in ES. If you don't have a whole host of young people who are learning how to do delivery or learning how to do these kinds of things, you will be in real challenges.
>
> ***

So, this has a couple of things. One is we get the new style of IT strength and skills. It also helps us from a cost perspective. Back to the gentlemen's question over there, is that if your labor pyramid isn't the right shape, you're carrying a lot of extra cost. The truth is we're still carrying a fair amount of extra costs across this Company because the overall labor pyramid doesn't look the way it should.

\*\*\*

Now, that's not something that changes like that. Changing the same shape of your labor pyramid takes a couple of years, but we are on it, and we're amping up our early career hiring, our college hiring. And we put in place an informal rule to some extent which is, listen, when you are replacing someone, really think about the new style of IT skills.

19.    In an SEC filing for dated May 22, 2014, Hewlett-Packard revised its previous job elimination estimate of 34,000, stating that the number would increase by 11,000 to 16,000.

20.    In October 2014, Hewlett-Packard announced its intention to split into two public companies, Hewlett Packard Enterprise ("HPE") and HP, Inc. ("HPI").

21.    On September 12, 2015, the Board of Directors for Hewlett-Packard approved a restructuring plan for the contemplated split and as part of it estimated that 33,000 more employees would exit by the end of fiscal year 2018, with up to 30,000 exiting HPE and approximately 3,300 exiting HP Inc.

22.     On October 31, 2015 and November 1, 2015, HP, Inc. and Hewlett

Packard Enterprise Company formerly came into existence.

23.     On November 1, 2015, Meg Whitman became Charmian of HP, Inc. and

CEO of Hewlett Packard Enterprise.  During a November 2, 2015, interview with

CNBC's David Faber Ms. Whitman expressed the following when questioned about

job cuts:

> Faber: Still with a quarter of a million people work the
> company, you did announce significant job cuts about a
> month or so ago, when you gave - - or maybe a bit more,
> six weeks—when you gave us more details.  Is that going
> to be it for HPE?
>
> ***
>
> Whitman: That should be it.  I mean, that will allow us to
> right size our enterprise services business to get the right
> onshore/offshore mix, to make sure that we have a labor
> pyramid with lots of young people coming in right out of
> college and graduate school and early in their careers.
> That's an important part of the future of the company.  So,
> it should be the last that we see.  And you know, this will
> take another couple of years and then we should be done.

**Plaintiff Enoh I. Enoh**
**(Race and Age Claims)**

24.     Plaintiff Enoh I. Enoh ("Enoh"), is 58 years old African-American who

began working for Hewlett-Packard in 1996 as a Customer Service Engineer.  Mr.

Enoh possesses a BSE degree in Information Systems Engineering and lives in

Baltimore, Maryland.

25.     After HP split into HPE and HPI in November 2015, Mr. Enoh's became an employee of HPE and his job title changed to that of Field Services Engineer. Despite receiving satisfactory evaluations for most of his career, Mr. Enoh was terminated by HPE on May 26, 2017.

26.     Before his termination, Mr. Enoh was part of a 14-member team of Field Services Engineers.  Of those 14 team members, three were African-American, and Mr. Enoh was the senior team member in terms years as an HP/HPE employee and chronological age.

27.     At the time of his termination Mr. Enoh's performance ratings were the same or better than most members of his team, however they were retained.  Mr. Enoh was informed that his separation was due to "restructuring," however to his knowledge he was the only individual on his team let go even though his performance was better or at least equal to his Caucasian and/or younger counterparts.

28.     Furthermore, shortly before terminating Mr. Enoh, HPE hired 5 or 6 Caucasian and/or younger employees.  Mr. Enoh was required to train and mentor some of these individuals.

29.     Moreover, HP, HPI, and HPE have or had very few African-Americans in positions above the District Manager level.  Their promotional practices have had

a disparate impact on African-Americans in that it has stifled their career progression. If Mr. Enoh's career had been allowed to progress without these racially discriminatory stumbling blocks, he would now have been a director level employee.

30.     The Defendants also discriminated against Mr. Enoh because of his age in that until the time of his termination he had been a model employee and should not have been subject to the workforce restructuring plan.

31.     Mr. Enoh was subjected to a reduction in force of one as the majority of the employees retained were younger than him.

<u>**Plaintiff Christopher Jackson's**</u>
**(Race and Age Claims)**

32.     Plaintiff Christopher Jackson ("Jackson") is a 52 year old African-American male. Mr. Jackson worked for Hewlett Packard from July 15, 1996 to July 18, 2016, with his last position being District Manager.

33.     Up until 2015, Mr. Jackson had always received satisfactory performance evaluations and his career with HP had been exemplary. In 2014, Mr. Jackson became aware of the promotion of two Caucasian male employees, Mark Valan and Thomas Medforth.

34.     Messrs. Valan and Medforth were promoted without the positions being posted for open-bid. HP's standard practice required mangers to submit a requisition

for a position and then it be posted for bid by interested applicants.  These individuals had been District Managers like Mr. Jackson and after their promotions he had to report to Mr. Medforth.

35.    In 2015, HP allowed Medforth to use an antiquated evaluative tool to measure the performance of District Managers. This evaluative tool was introduced mid-year and disproportionately graded as low the performance of African-American managers.

36.    Based on this evaluative tool, Mr. Jackson was rated as "Partially Achieved" which means that he did not meet his performance goals for the rating period.  In November 2015, Medforth was elevated as Manager for all District Managers.  Mr. Jackson did not get a chance to compete for this position as his low rating of that same year precluded him from applying.  Also, at this time, Mr. Jackson became an employee of HPI.

37.    After Medforth assumed his new role, Mr. Jackson and other African-American District Managers requested additional resources in the form of personnel to meet the demands of their territories.  Each of their requests were denied. Caucasian District Managers who made the same requests received additional resources in the form of personnel.

38.     This caused the African-American managers to miss their production goals.   On June 29, 2016, Mr. Jackson complained to HPI that he was being discriminated against because of his race.

39.     On July 18, 2016, Mr. Jackson was informed that he was being terminated.  Mr. Jackson was informed that his separation was due to "restructuring", however, he was the only individual in his department let go even though his performance was better or at least equal to that of his Caucasian and/or younger counterparts.

40.     Mr. Jackson personally observed that HP, HPE, and HPI has or had very few African-Americans in positions above the District Manager level.

**Plaintiff Derek L. Mobley's**
**(Race Claims)**

41.     Plaintiff Derek L. Mobley ("Mobley") is an African-American male. He began working for HPE in November 2016 as a contract employee.  Mr. Mobley has Bachelor of Arts in Finance from Morehouse College, an Associates Degree in Network Systems Administration, from ITT Technical Institute, and is currently pursuing a Masters of Business Administration [Information Technology Management] from Florida Tech.  Mr. Mobley is a resident of Atlanta, Georgia.

42.     In November 2016, Mr. Mobley was part of a training class for Advanced Solutions Engineers.  Mr. Mobley was the only member of his training class with a Server + Certification which was directly applicable to the job.  This training class was made up of contract workers who were trying to gain permanent employment with HPE.

43.     Upon entering this training program, Mr. Mobley and the other members of the training class were informed by HPE's representatives that if their performance was satisfactory they would transition to full-time employment within 4 to 6 months.

44.     Mr. Mobley's class was made up of approximately seventeen individuals, 14 African-Americans, two Caucasians, and one Turkish-American.  Around April of 2017, HPE announced that they were instituting a hiring freeze.

45.     Later in April 2017, Mr. Mobley learned that the only remaining Caucasian contract worker in the training class was hired as a full-time employee despite the alleged hiring freeze.

46.     The other Caucasian contract worker had resigned. Mr. Mobley later inquired as to whether there were any other positions that had become "unfrozen" and was instructed to visit HPE's website.

47.     Upon visiting the website, Mr. Mobley observed approximately 15 open positions, including openings for the job he is currently performing.  Mr. Mobley

applied for approximately 7 of these jobs, including the one he is currently performing.  Mr. Mobley was rejected for each of these jobs even though his performance ratings were satisfactory and there was nothing in his employment history as contract worker that would serve to disqualify him.

48.     HPE in contravention of its own allegedly non-discriminatory hiring practices did not post all jobs and instead relied on a "tap on the shoulder" procedure whereby it awarded positions of higher pay and prestige to Caucasian employees.

### Plaintiff William Murrell's
### (Race Claims)

49.     Plaintiff Willaim Murrell is an African-American male.  In 2000 or 2001, Mr. Murrell began working for HP as a contract employee.  For the next 5 or 6 years, Mr. Murrell attempted to become a regular full-time employee of HP but was not successful until 2007.

50.     Caucasian contract workers did not have wait this long before they became full-time employees with HP.  Mr. Murrell is a resident of Atlanta, Georgia. Upon hiring on full-time with HP, Mr. Murrell's job title was Field Service Support Representative.

51.     Mr. Murrell has two associate degrees and a Bachelor's Degree in Business Administration.  In or around November 2015, Mr. Murrell began working

for HPE and was re-classified as a Field Service Support Representative II.

52.     As Field Service Support Representative II, Mr. Murrell performed satisfactorily and received favorable performance reviews.  He also served as a Senior Team Lead and in that role he was responsible for monitoring the day to day work of less senior team members.

53.     Around January or February 2016, Mr. Murrell was informed by his manager, Christopher Jackson [African-American] that he was being considered for a merit promotion to the position of Customer Engineer III. [Doc.#30: ¶76].

54.     At that time, Mr. Murrell had been a Field Services Support Representative for approximately 9 years.  Caucasian employees who started their careers at the same time as Mr. Murrell and that were in his peer group, have advanced much faster through the company to where they are now District Managers or in other positions of higher authority, prestige and pay.

55.     On January 26, 2017, Thomas Medford [Caucasian male] announced the promotion of 17 individuals.  Mr. Murrell was not selected for promotion and instead two Caucasian junior Team Leads [Bill Howell & Robert Brown] were.

56.     These individuals had been Team Leads for a little over a year but were promoted ahead of Mr. Murrell.  Mr. Murrell did not receive an interview.  [Id.]. After learning of these promotions, Mr. Murrell lodged a complaint with HPE's

Human Resource department in Palo Alto, California.

## VI.     COLLECTIVE ACTION DEFINITION

57.     Plaintiffs [Enoh I. Enoh and Christopher Jackson] bring this collective action pursuant to 29 U.S.C. §§ 216(b), 626(b) seeking liability-phase injunctive and declaratory relief on behalf of a collective of all individuals over the age of 40 and older in the United States denied promotions and laid-off at any time from January 21, 2016 through the resolution of this action for claims under the ADEA.

58.     Plaintiffs also bring this collective action pursuant to 29 U.S.C. §§ 216(b), 626(b) for monetary damages and other make-whole relief on behalf of a collective of all individuals over the age of 40 denied promotions and laid-off in the United States at any time from January 21, 2016 through the resolution of this action for claims under the ADEA.

59.     Plaintiffs and other potential members of the collective are similarly situated in that they have all sought and been denied or were deterred from applying for promotions and/or were laid-off as a result of the Defendants' ageist policies and practices that have the purpose and effect of denying them employment opportunities because of their age.

60.     There are many similarly situated collective members who would benefit from the issuance of a court-supervised notice of the present lawsuit and the

opportunity to join the present lawsuit. Notice should be sent to the collective pursuant to 29 U.S.C. §§ 216(b), 626(b).

61.     As part of its regular business practice, Defendants' have intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the ADEA with respect to Plaintiffs and the collective. This policy and pattern or practice includes, but is not limited to:

a. willfully refusing to promote individuals over the age of 40; and,

b. willfully implementing a lay-off scheme that targeted individuals over the age of 40 for termination.

62.     Defendants maintained and implemented these policies and practices with the purpose and effect of denying Plaintiffs and other members of the collective employment opportunities because of their age. These policies cannot be justified on the basis of reasonable factors other than age.

63.     Defendants are aware or should have been aware that federal law prohibits it from considering an employee's age with regard to promotions and lay-offs.

## VII.   CLASS ACTION DEFINITION
   (Race Discrimination)

64.     The Representative Plaintiffs sue on behalf of themselves and on behalf of all other similarly situated current, past, present, and future employees of the

Defendants who are African-American/black, who have been, continue to be, or in the future subject to one or more aspects of the systemic race discrimination described in this Complaint. Such systemic race discrimination includes the Defendants (1) failure to promulgate, maintain, and enforce racially non-discriminatory employment policies and practices; (2) racially unequal terms and conditions of employment; and (3) racially discriminatory selection policies.

65. The claims herein have been brought and may properly be maintained as a class action because there is a well-defined community of interest among Class members with respect to the claims asserted herein and the proposed Class is ascertainable:

## A. COMMON QUESTIONS OF LAW AND FACT

66. The prosecution of the claims of the Representative Plaintiffs requires adjudication of numerous questions of law and fact common to their individual claims and those of the putative classes they seek to represent. The common questions of law would include, inter alia: whether the Defendant has engaged in systemic race discrimination in its tolerance of racially discriminatory selection and promotion policies, and in the general terms and conditions of work and employment in a manner made unlawful under the "Civil Rights Act of 1964," 42 U.S.C. § 2000 et seq., and "The Civil Rights Act of 1866," 42 U.S.C. § 1981and 1981a. The common

questions of fact would include, inter alia: (1) whether HP discriminated against African-American employees because of their race with regards to hiring, promotions and layoffs; (2) whether compensatory and punitive damages, injunctive relief, and other equitable remedies for the class are warranted; and (3) whether HP discriminated against African-Americans in other terms and conditions of employment.  The details of the Representative Plaintiffs' claims are encompassed within the claims prosecuted on behalf of the class and set forth in this Complaint.

## B. **TYPICALITY**

67.     The claims of the Representative Plaintiffs are typical of those of the members of the class.  The Representative Plaintiffs and all class members have been and are similarly adversely affected by the systemic racially discriminatory practices complained of herein.  Specifically, the representative claims, like those of the class members, arise out of Defendant's pervasive discriminatory conduct with regard to race discrimination in hiring, promotions, layoffs and other terms and conditions of employment.  The relief necessary to remedy the claims of the Representative Plaintiffs is the same relief that is necessary to remedy the claims of the putative class members in this case.  The Representative Plaintiffs seek the following relief for individual claims and class claims asserted herein:  (1) declaratory judgment that Defendant has engaged in systemic race discrimination against African-Americans;

(2) a permanent injunction against such continuing discrimination; (3) injunctive relief which restructures HP's selection, lay-off and work environment policies, practices and procedures so that Plaintiffs and class members will be able to compete fairly in the future for jobs, promotions and enjoy terms and conditions of employment traditionally afforded similarly situated Caucasian employees; (4) backpay, front pay, compensatory damages, and other equitable remedies necessary to make the Plaintiffs, and the class, whole from HP's past discrimination; and, (5) attorneys' fees, costs, and expenses.

### C.  NUMEROSITY AND IMPRACTICABILITY OF JOINDER

68.     The class that the Representative Plaintiffs seek to represent is too numerous to make joinder practicable.  The proposed class consists of numerous former, current, and future African-Americans who either have been, are, or will be, employed by HP.  HP's pattern and practice of race discrimination also makes joinder impracticable by making it impractical and inefficient to identify many members of the class prior to the determination of the merits of HP's class wide liability.  Thus, the number of Class members is currently indeterminate, but is certainly numerous.

### D.  ADEQUACY OF REPRESENTATION

69.     The Representative Plaintiffs will fairly and adequately protect the interests of the class inasmuch as they are broadly representative, as reflected in the

preceding paragraphs.  There are no conflicts of interest present with the members of the proposed class as each would benefit from the imposition of a remedy for the Defendant's discriminatory employment practices.  The Representative Plaintiffs have retained counsel experienced in litigating major class actions in the field of employment discrimination, and who are prepared and able to meet the time and fiscal demands of class action litigation of this size and complexity.  The combined interest, experience, and resources of the Representative Plaintiffs and their counsel to litigate competently the individual and class claims of the race based employment discrimination at issue satisfy the adequacy of representation requirement under Fed.R.Civ.P. 23(a)(4).

### E.  EFFICIENCY OF CLASS PROSECUTION OF COMMON CLAIMS

70.    Certification of a class of similarly-situated African-Americans is the most efficient and economical means of resolving the questions of law and fact that are common to the individual claims of the Representative Plaintiffs and the proposed class. The individual claims of the Representative Plaintiffs require resolution of the common question of whether Defendant has engaged in a systemic pattern of discrimination against African-Americans.   The Representative Plaintiffs seek remedies to undo the adverse effects of such discrimination in their own lives, careers

and working conditions and to prevent such in the future. The Representative Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on African-Americans, in general. In order to gain such relief for themselves, as well as for the putative class members, the Representative Plaintiffs will first establish the existence of systemic race discrimination as the premise of the relief they seek. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the class of African-Americans affected by the common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Representative Plaintiffs, the class and the Defendant. The Representative Plaintiffs' individual and class claims are premised upon the traditional bifurcated method of proof and trial for systemic disparate treatment claims of the type at issue in this complaint. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

## F.  CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(b)(2)

71.    HP has acted on grounds generally applicable to the named Plaintiffs

and the proposed class by adopting and following systemic practices and procedures that discriminate on the basis of race. Race discrimination are HP's standard operating procedure rather than sporadic occurrences. HP refused to act on grounds generally applicable to the putative class by: (1) refusing to adopt or follow selection procedures which do not systemically discriminate against African-Americans; and (2) refusing to provide equal terms and conditions of work to African-Americans. HP's systemic race discrimination and refusal to act on grounds that are non-discriminatory have made appropriate final injunctive relief and declaratory relief with respect to the class as a whole. The injunctive relief and declaratory relief are the predominate reliefs sought because they are both the cumulation of the proof of the Defendant's individual and class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the named Plaintiffs' and class members' entitlement to monetary and non-monetary remedies at Stage II of such a trial. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic racial discrimination against African-American individuals. Such relief is the factual and legal predicate for the named Plaintiffs' and the class members' entitlement to injunctive and equitable remedies caused by such systemic discrimination.

## G.  ALTERNATIVELY CERTIFICATION IS SOUGHT PURSUANT TO FED. R.CIV. P. 23(b)(3)

72.    The common issues of fact and law affecting the claims of the Representative Plaintiffs and proposed class members, including, but not limited to, the common issues identified above, predominate, over any issues affecting only individual claims.  A class action is superior to other available means for the fair and efficient adjudication of the claims of the named Plaintiffs and members of the proposed class.

73.    The cost of proving the Defendant's pattern or practice of discrimination makes it impracticable for the named Plaintiffs and members of the proposed class to control the prosecution of their claims individually.  The Northern District of California is the most logical forum in which to litigate the claims of the Representative Plaintiffs and the proposed class in this case because the Defendant's home office is here; the persons responsible for overseeing the human resources function are here; upon information and belief HP maintains personnel records here; and engages in or ratifies illegal conduct adversely affecting the Plaintiffs here.

## H.  ALTERNATIVELY CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(c)(4) FOR INJUNCTIVE AND DECLARATORY RELIEF

74.    Alternatively, claims for injunctive and declaratory relief for the Injunctive Relief Class are properly certified under Federal Rule of Civil Procedure 23(c)(4) because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## I.  ALTERNATIVELY CERTIFICATION IS SOUGHT PURSUANT TO FED. R. CIV. P. 23(c)(4) FOR CLASS WIDE LIABILITY

75.    Alternatively, class wide liability claims are properly certified under Federal Rule of Civil Procedure 23(c)(4) for the Classes because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## J.  PUNITIVE DAMAGES MAY ALTERNATIVELY BE CERTIFIED PURSUANT TO FED.R.CIV.P. 23(b)(2)

76.    Punitive damages liability may alternatively be certified under Federal Rule of Civil Procedure 23(b)(2) because such relief focuses on the conduct of HP and not the individual characteristics of the Plaintiffs and are an allowable form of incidental monetary relief.

## VIII.  COUNTS

### COUNT ONE

### Intentional Discrimination on the Basis of Race
### in Violation of Title VII of the
### Civil Rights Act of 1964 and 42 U.S.C. § 1981

77.    Representative Plaintiffs restate and incorporate by reference all applicable paragraphs above as part of this Count of the Complaint.

78.    Defendants have discriminated against the Representative Plaintiffs and the class they seek to represent with regards to selection procedures and other terms and conditions of employment because of their race, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

79.    Defendants' conduct has been intentional, deliberate, willful and conducted with disregard for the rights of Plaintiffs and members of the proposed class.

80.    By reason of Defendants' discriminatory employment practices, the Representative Plaintiffs and the proposed class members have experienced extreme harm, including loss of compensation, wages, back and front pay, and other employment benefits, and, as such, are entitled to all legal and equitable remedies available under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

## COUNT TWO

### Disparate Impact Discrimination on the Basis of Race
### In Violation of Title VII of the Civil Rights Act of 1964

81.     Representative Plaintiffs restate and incorporate by reference all applicable paragraphs above as part of this Count of the Complaint.

82.     The criteria utilized by Defendants in making selection decisions-to include promotions and lay-offs-discriminate on the basis of race in violation of §703(k) of Title VII, 42 U.S.C. §2000e-2(k).

83.     Defendants allowed an overwhelmingly Caucasian group of selectors to use a company wide "Performance Evaluation" policy that allowed them to manipulate the selection process to the detriment of their African-American employees.

84.     These processes disparately impacted African-American employees because they allow subjectivity and favoritism to influence employment decisions. Because of this, the decision-makers are free to exercise their discretion in an unguided, subjective manner that provides a ready mechanism for Caucasians to vent discriminatory feelings upon African-American employees.

85.     Defendants have maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case.

86.    As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiffs and the class they seek to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

## COUNT THREE

### Intentional Discrimination
### Age Discrimination in Employment Act of 1967

87.    Representative Plaintiffs restate and incorporate by reference all applicable paragraphs above as part of this Count of the Complaint.

88.    This Claim is brought by the Representative Plaintiffs on behalf of themselves and the collective they seek to represent. Defendants engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against employees ages 40 and older.

89.    Defendants have intentionally discriminated against the Plaintiffs and the collective in violation of the ADEA by, among other things:

> a. willfully refusing to promote individuals over the age of 40; and,

> b. willfully implementing a lay-off scheme that targeted individuals over the age of 40 for termination.

90.     These company-wide policies are intended to and do have the effect of denying Plaintiffs and the collective of employment opportunities because of their age. The discriminatory acts that constitute Defendants' pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

91.     As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiffs and the collective have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

92.     The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 29 U.S.C. § 623(a)(1).

## COUNT FOUR

### Disparate Impact Discrimination
### Age Discrimination in Employment Act of 1967

93.     Representative Plaintiffs restate and incorporate by reference all applicable paragraphs above as part of this Count of the Complaint.

94.     This Claim is brought by Representative Plaintiffs on behalf of themselves and the collective they seek to represent.   Defendants maintain discriminatory policies, patterns, and/or practices that have an adverse impact on employees ages 40 and older in violation of the ADEA and are not, and cannot be, justified by reasonable factors other than age.

95.     Specifically Defendants' promotions and facially neutral lay-off policies have had a disparate impact on individuals over the age of 40.

96.     Defendants have maintained these discriminatory policies, patterns, and/or practices both within and outside the liability period in this case.

97.     As a direct result of the Defendants' discriminatory policies and/or practices as described above, Plaintiffs and the collective they seek to represent have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs and the Class pray for relief as follow:

1.     Certification of the case as a class action on behalf the proposed classes;

2.     Designation of Plaintiffs as representatives of the Class;

3.     Designation of Plaintiffs' Counsel of record as Class Counsel;

4.     A declaratory judgment that the practices complained of herein are unlawful and violate Title VII, 42 U.S.C. § 1981 and the ADEA;

5.     A preliminary and permanent injunction against the Company and its officers, agent, successors employees, representatives, and any and all persons acting in correct with them from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

6.     An order that the Company institute and carry out policies, practices, and programs that provide equal employment opportunities for all minorities, and that it eradicate the effects of its past and present unlawful employment practices;

7.     For back pay, front pay and other monetary relief according to proof (including interest and benefits);

8.     For all damages sustained as a result of the Company's conduct according to proof;

9.     For compensatory damages, nominal damages, and liquidated damages according to proof;

10.     For exemplary and punitive damages in an amount commensurate with the Company's ability to pay, to deter future conduct, and to set an example for others;

11.     For reasonable attorneys' fees and cost including under to the extent allowable by law;

12.     Pre-judgment and post-judgment interest, as provided by law;

13.     For such ancillary orders, decrees and such further legal and equitable relief as may be necessary to enjoin and restrain the improper conduct and wrongdoing of Defendant; and,

14.     For such other and further relief as the Court deems proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,


/s/Roderick T. Cooks
Roderick T. Cooks (*pro hac vice forthcoming*)
Lee D. Winston (*pro hac vice forthcoming*)
Alan H. Garber (Admitted in Georgia)

Attorney for the Plaintiffs and Proposed
Class and Collective Action Members


**OF COUNSEL:**
Winston Cooks, LLC
505 20th Street North
Suite#815
Birmingham, AL 35203
Telephone:   (205) 502-0970
Facsimile:    (205) 278-5876

The Garber Law Firm, P.C.
Suite 14
4994 Lower Roswell Road
Marietta, GA 30068
Tel. (678) 560-6685
Fax. (678) 560-5067